**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action Case No. 1:14-cv-00693 |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN DOE subscriber assigned IP address | ) | |
| 24.148.79.226, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S STATUS AND INFORMATIONAL REPORT FOR ITS CASES IN THE**
**NORTHERN DISTRICT OF ILLINOIS**

Malibu Media, LLC, ("Malibu"), by its undersigned attorney, provides this status report in accordance with this Court's previous order. This report applies to the following cases, 13 cv 2702, 13 cv 6417, 13 cv 7139, 13 cv 8473 and 14 cv 1136, as well as this case.

## I.     INTRODUCTION

Plaintiff Malibu is the creator of high-end adult content for its subscription website X-Art.com. Malibu currently has tens of thousands of subscribers. The popularity of its movies has evinced a high demand. Unfortunately, many people have decided to take its movies illegally through the BitTorrent protocol instead of lawfully subscribing to its website. Plaintiff knows that during the period of January 1, 2014 through March 21, 2014, there were at least 175,000 Americans who infringed its content within the BitTorrent file distribution network, many of which reside in this district.[1] Plaintiff has no other way to make the infringement stop and seek recourse for its losses than to bring a suit like the one before this Court. Below is a status report

---
[1] *See* Exhibit G for a complete breakdown of the number of infringers per state during the applicable time period.

on all of Plaintiff's cases in the Northern District of Illinois along with a brief memorandum about Plaintiff and how it is different from other copyright plaintiffs in this district.

## II.    STATUS REPORT

The Court has requested a status report pertaining to all cases filed by Plaintiff within the Northern District of Illinois. Attached as Exhibit A is a list of all Malibu's cases filed within the Northern District of Illinois. Each Defendant within each case is outlined along with a descriptive status of the case's current status. In totality, Malibu has filed 268 cases within the Northern District of Illinois. Of these 268 cases, 25 cases were with joined defendants and 243 cases were actions filed against a single Defendant, like the current case at hand. The 268 cases filed by Malibu had a total of 886 Defendants between them. Of these 886 defendants, 643 were within joined suits and 243 defendants were from cases against only a single defendant. Each defendant infringed, on average, 17.9 separate copyrighted works owned by Malibu between all 886 Defendants.

### A.    Categories Relating to a Defendant's Status

In order to explain the position of each defendant in each of Plaintiff's cases, Plaintiff has categorized each dismissed defendant in one of four ways: (1) Hardship; (2) Insufficient Evidence; (3) No Discovery; (4) Dismissed – settled. Below is a description of each category.

#### 1.    Hardship

Hardship is when a defendant may be liable for the conduct, but has extenuating circumstances where Plaintiff does not wish to proceed against him or her. Examples are when a defendant has little or no assets, defendant has serious illness or has recently deceased, defendant is currently active duty US military, defendant is a charitable organization or school, etc.

2. Insufficient Evidence

Insufficient evidence is defined as when Plaintiff's evidence does not raise a strong presumption that the defendant is the infringer or some other ambiguity causes Malibu to question the Defendant's innocence. In order to determine whether the subscriber is the infringer, or if the infringer can be identified, after receiving the name of the subscriber from the ISP, Malibu conducts an investigation and considers such factors as (1) length of the infringement, i.e. how long it took place, when it began, when it ended, whether it took place during the day or night, and any other patterns; (2) location of the residence where the infringement occurred, i.e. whether it is in a remote location or with other dwellings within wireless access range; and (3) additional evidence.

Malibu's additional evidence is a comprehensive scan of a high percentage of all BitTorrent activity within the United States of America on all known pirated content owned by all worldwide content owners. To put it simply, it is a list of all other BitTorrent content that is downloaded by a defendant in a lawsuit. This includes music, mainstream movies, ebooks, computer programs, software, etc.

After a massive undertaking with significant resources and expense, Malibu's investigators began to scan for "Additional Evidence" in July of 2012. Originally, the results of this scan were filed as an Exhibit within the initial pleadings, however, select judges determined that the results of this surveillance should not be filed as an exhibit to any case. Consequently, Malibu analyzes and archives the results of this surveillance and references the statistics within the applicable Complaint. The evidence gleaned from this comprehensive scan is critical to determining the identity of the responsible party. As an example, Malibu can compare a subscriber's Facebook page to its Additional Evidence list associated with the subscriber's IP

address. Oftentimes, a subscriber will publicly admit on social media to enjoying sports teams, music groups, or favorite TV shows. Malibu will compare their likes and interests to their Additional Evidence and determine whether the interests match.

Malibu has adopted high standards prior to serving a Defendant and in some cases has determined to not pursue a case based on insufficient evidence. Examples of scenarios in which Malibu may dismiss based on insufficient evidence include: multiple roommates within one residence with similar profiles and interests share a single Internet connection; the defendant has left the country and cannot be located; the results of additional surveillance do not specifically match profile interests or occupation of Defendant or other authorized users of the Internet connection; the subscriber is a small business with public Wi-Fi access, etc.

Further, Malibu will dismiss its claims against any Defendant who agrees to and passes a polygraph administered by a licensed examiner of the Defendant's choosing. Out of the entirety of polygraphs administered within the United States by Malibu, no Defendant has passed and all such examinations have subsequently led to the Defendant settling the case.

3. No Discovery

Plaintiff's category labeled no discovery refers to situations where the subpoena response from the ISP is either not received or insufficient to identify an infringer. Scenarios in which a case must be dismissed prior to obtaining subscriber information discovery from the applicable Internet Service Provider include: the applicable hit date is beyond the ISP's data retention policies; the subpoena to the ISP was quashed due to the case being severed; the subscriber information on file with the ISP does not match known occupants of the address pursuant to Accurint database; the ISP could not associate the IP with a subscriber at the stipulated hit date and time.

4. Dismissed - Settled

These cases are cases in which Plaintiff and the defendant were able to settle Plaintiff's claims.

## A. Previous Cases Involving Joined Defendants

Of the twenty-five cases which Malibu previously filed with joined defendants, all are closed. Exhibit B details the current dispositions, in the aggregate, of all Defendants within joined cases filed by Malibu. A brief overview is as follows:

Dismissed - Hardship: 41 Defendants

Dismissed - Insufficient Evidence: 219 Defendants

Dismissed - No Discovery: 273 Defendants

Dismissed – Settled: 110 Defendants

## B. Settled Cases Against Defendants

Of the 886 defendants in cases filed by Plaintiff in the Northern District of Illinois, 174 defendants have settled the case against them. Out of these 174 settling Defendants, Exhibit A illustrates that 150 of them were represented by counsel while 24 of them elected to settle pro se.

## C. Plaintiff's Cases Involving Individual Defendants

Currently, out of the 243 cases filed against individual defendants, there are 100 cases still open. *See* Exhibit C. In their entirety, the following are the current statuses of all sole-Defendant suits filed by Malibu in the Northern District of Illinois:

Dismissed - Hardship: 13 Defendants

Dismissed - Insufficient Evidence: 35 Defendants

Dismissed - No Discovery: 31 Defendants

Dismissed - Settled: 64 Defendants

Judgment Entered: 2 Defendants

Litigation: 8 Defendants

Suits Currently in Settlement Negotiations: 30 Defendants

Pre-Discovery (Awaiting an Order Granting Leave to Subpoena the ISP): 42 Defendants

Pre-Litigation (In the Process of Preparing for Service/Investigating): 18 Defendants

### D. Status Regarding Total Defendants

Current dispositions combining both joined and individual Malibu suits within the Northern District of Illinois are as follows:

Dismissed - Hardship: 49

Dismissed - Insufficient Evidence: 259

Dismissed - No Discovery: 304

Dismissed - Settled: 174

Judgment Entered: 2

Litigation: 8

Negotiating: 30

Pre-Discovery (Awaiting an Order Granting Leave to Subpoena the ISP): 42

Pre-Litigation (In the Process of Preparing for Service/Investigating): 18

### E.  Judgments Entered Against Defendants

Of the cases Plaintiff has filed in this district, two cases have resulted in final judgments:

1:13-cv-00902 - Statutory Damages of $26,250.00 awarded

1:13-cv-02 659 - Statutory Damages of $15,000.00 awarded

### F.  Cases In The Process of Litigation

A total of eight Malibu cases in the Northern District of Illinois are currently in litigation with no immediate prospects of settling:

*Malibu Media v. Roman*, 1:13-cv-00913

o  Defendant is represented by attorney Morgan Pietz.  Plaintiff propounded discovery in late 2013 and has not yet received any response.  Plaintiff is currently in the process of filing a motion to compel.

*Malibu Media v. John Doe*, 1:13-cv-02702

o  This case is before your Honor and Defendant is also represented by attorney Morgan Pietz.  Plaintiff has propounded discovery and is waiting for a response.  Additionally, Plaintiff has moved to strike Defendant's affirmative defenses.

*Malibu Media v. John Doe*, 1:13-cv-03648

o  Defendant is represented by attorney Morgan Pietz.  Defendant has filed a counterclaim and Plaintiff has moved to dismiss the counterclaim and to strike Defendant's affirmative defenses.  Discovery has been stayed until the ruling of the motions.

*Malibu Media v. John Doe*, 1:13-cv-03707

o  Defendant is represented by attorney Morgan Pietz.  Defendant has filed a counterclaim and Plaintiff has moved to dismiss the counterclaim and to strike Defendant's

affirmative defenses.

*Malibu Media v. John Doe*, 1:13-cv-06312

    o   Defendant is represented by attorney Jonathan Phillips. Plaintiff and Defendant are engaged in discovery and currently have been unable to resolve issues such as a proper protective order for Plaintiff's investigator's software.

*Malibu Media v. John Doe*, 1:13-cv-06320

    o   Defendant is represented by attorney Glenn Gaffney and Justin Gaffney. Plaintiff is in the process of serving Defendant with its discovery requests.

*Malibu Media v. John Doe*, 1:13-cv-06417

    o   Defendant is represented pro se and this case is before your Honor. Defendant has answered but the parties have not yet started the discovery process. However, serious settlement discussions may ultimately be successful.

*Malibu Media v. John Doe*, 1:13-cv-08484

    o   Defendant is represented by attorney Jonathan Phillips. The Court recently denied Defendant's Motion to Vacate the Court's Order Granting Early Discovery, To Quash Subpoena, and to Show Cause Why Malibu and Its Counsel Should Not Be Sanctioned. Defendant's motion was premised on the incorrect assumption that Malibu had entered into a contingency agreement with a witness. The Honorable Judge Ellis found in Plaintiff's favor and noted that Plaintiff provided declarations that IPP is paid only for data collection services, had not been compensated for any work relating to the specific case, and that Malibu has never paid nor offered to pay Mr. Feiser anything for his testimony. *See* CM/ECF 25.

**A. Cases In Settlement Negotiations**

A total of 30 Defendants within Malibu cases are currently negotiating settlement. Of

these 30 cases, there are 14 with executed Settlement Agreements.

### B. Pre-Discovery Status

A total of 42 Defendants are in "Pre-Discovery" status. Scenarios within this status include:

There has been no ruling yet by the Court on Plaintiff's Motion for Expedited Discovery

The ISP is in the process of notifying the subscriber about the suit pursuant to its obligations under the Cable Act

The ISP is still processing the lookup

### A. Pre-Litigation Status

A total of 18 Defendants within Malibu cases filed in the Northern District of Illinois are in "Pre-Litigation" status. Scenarios within this status include:

Plaintiff is in the process of amending the Initial Complaint

Plaintiff's process server is actively attempting to serve the Defendant

Plaintiff has served the Defendant who has not yet Answered the Complaint

Defendant has not Answered the Complaint in a timely fashion and thus Plaintiff has filed for Default Judgment on 1:13-cv-02614 and 1:13-cv-07314.

### A. Number of Defendants Served

A total of 44 Defendants have been served into the applicable case within the Northern District of Illnois. *See* Exhibit D for a complete overview.

## I. MEMORANDUM REGARDING PLAINTIFF'S INTENT AND PURPOSE

A. Online Copyright Infringement Through the BitTorrent Protocol is a Serious and Significant Threat to Plaintiff's Business

Colette Pelissier Field, with her husband Brigham Field, are the owners of Malibu and began their business from scratch. *See* CM/ECF 11-1 at ¶3. The Fields both felt that there was a lack of adult content that was beautiful and acceptable for women and couples. *Id*. at ¶ 6. The Fields wanted to create this type of content to satisfy what they hoped was an unfulfilled demand. *Id*. Their goal was to create erotica that is artistic and beautiful. *Id*. at ¶ 7. The Fields chose the name 'X-Art' to reflect their artistic aspirations, and began investing all of their available money and resources into the production of content – particularly erotic movies with high production value and a cinematic quality. *Id*. at ¶ 8.

Currently, X-Art.com has tens of thousands of members, but the Fields are finding it hard to grow and maintain the memberships when so many people are finding their films for free. *Id*. at ¶ 15. They have worked hard and invested millions of dollars into their business in order to produce the best quality product. *Id*. at ¶ 14. For the first three years (when their site was not as popular) they did not have as many issues with piracy. *Id.* at ¶ 18. Now that their videos are highly desirable, more people steal their videos than pay for a subscription. *Id*. Malibu receives many complaints from its members asking why they should pay to subscribe when Malibu's movies are available for free through BitTorrent. *Id*. at ¶ 19. Plaintiff Malibu has filed suit in this judicial District and in judicial districts across the country seeking to deter and stop the infringement.

Last June, Plaintiff won the first ever BitTorrent copyright infringement lawsuit to reach trial. *See Id*. In his Memorandum Report after the conclusion of the trial, the Honorable Judge Baylson made a number of significant findings. Importantly, Judge Baylson found "Malibu Media Malibu has satisfied its burden of proof with substantial evidence and deserves a large award*." Malibu Media, LLC v. John Does 1, 6, 13, 14*, CIV.A. 12-2078, 2013 WL 3038025

(E.D. Pa. June 18, 2013).

> B. Courts throughout the Country Have Expressly Found that Malibu's Counsel do not Engage in Improper Litigation Tactics

Judge Baylson expressly emphasized that "Malibu is *not* what has been referred to in the media and legal publications, and in the internet blogosphere, as a 'copyright troll' . . . Rather, Malibu is an actual producer of adult films and owns valid copyrights, registered with the United States Copyright Office, in its works." *Id.* (Emphasis in original). Similarly, the Honorable Judge Hegarty of the District of Colorado has stated: "the Court has also witnessed firsthand the Plaintiff's willingness to resolve cases without any monetary payment when a Defendant credibly denies infringement." *Malibu Media, LLC v. John Does 1-2, 4-8, 10-16, 18-21*, 2013 WL 1777710 (D. Colo. Feb. 12, 2013).

Other courts have also opined that the criticism Plaintiff receives is unwarranted. "[Defendant] has not presented any evidence that Malibu has engaged in harassing behavior for the Court to consider, nor has the Court observed bad faith behavior or the use of improper tactics on its part thus far." *Malibu Media, LLC v. John Does 1-6*, 2013 WL 2150679 (N.D. Ill. May 17, 2013). *See also Malibu Media, LLC v. John Does 1-5,* 2012 WL 3641291, at *4 (S.D.N.Y. 2012) (same); *Malibu Media, LLC v. John Does 1-30*, 2:12-cv-13312-DPH-MJH [CM/ECF 61] at p. 15 (E.D. Mich. May 16, 2013) (same); *Malibu Media, LLC v. Reynolds*, 2013 WL 870618 at *7 (N.D. Ill. Mar. 7, 2013) ("the fact that suits of this nature settle quickly does not mean there is any wrongdoing on the part of copyright owners."); *Malibu Media, LLC v. John Does 1-9*, 8:12-cv-00669-SDM-AEP [CM/ECF 25] at p. 7 (M.D. Fla. July 6, 2012) (same).

> C. Malibu Has Valid Copyrights

All works included within suits filed by Malibu in all cases are properly registered with

the United States Copyright Office and have valid copyrights.  *See* Exhibit E.  These works are created by Malibu for the tens of thousands of subscribers that pay a fee each month to view their website.  *See* CM/ECF 11-1 at ¶15.

### D.  Malibu Does Not Ever Object to a Defendant Proceeding Anonymously

Malibu does not seek to embarrass defendants and has informed its counsel to never oppose a defendant's motion to proceed anonymously. This has been the case across the board for *every* individual suit it has ever filed.   Numerous courts throughout the country have documented this policy.  While not a complete list *see Malibu Media, LLC v. John Does 1-16*, 902 F. Supp. 2d 690, 701 (E.D. Pa. 2012) ("Plaintiff does not object to the issuance of a protective order to prevent the public disclosure of the John Does' identities"); *see also Malibu Media, LLC v. Reynolds*, 12 C 6672, 2013 WL 870618 (N.D. Ill. Mar. 7, 2013) (same); *Malibu Media LLC v. John Does 1-28*, 12-CV-12598, 2012 WL 7748917 (E.D. Mich. Oct. 31, 2012) (same); *Malibu Media, LLC v. John Does 1-23*, 5:12-CV-04442, 2013 WL 1389763 (E.D. Pa. Apr. 3, 2013) (same); *Malibu Media, LLC v. Doe*, 13-21579-CIV, 2013 WL 2950593 (S.D. Fla. June 14, 2013) (same); *Malibu Media, LLC v. Does 1-59*, 1CV12-0888 AWI DLB, 2012 WL 4465359 (E.D. Cal. Sept. 25, 2012) (same).

### E.    Malibu's Current Policy is Not to Contact Doe Defendants Regarding Settlements

In connection with beginning to sue infringers individually, Malibu's counsel discussed between and among themselves a policy by which they would *not* contact doe defendants that were sued in an individual suit for the purpose of soliciting a settlement.[2]  That policy has been in effect for *every* individual suit that Malibu has filed.  Significantly, that policy was in effect at

---

[2]   This is a pre-service policy.   During the lawsuit, Rule 26(f) requires the parties to discuss settlement.  And, if necessary or appropriate, Plaintiff may first raise the issue of settling a matter during an active litigation.

the time the instant suits were filed. Accordingly, no phone calls or letters have ever been sent to doe defendants soliciting a settlement in an individual suit. Instead, doe defendants or their attorneys routinely call Plaintiff's counsel for the purpose of discussing a dispute. Usually at the request of the doe defendant or opposing counsel, those conversations involve settlement negotiations. And, Malibu's attorneys, including undersigned, negotiate with adverse counsel in good faith.

### F. Malibu Does Not Seed its Own Copyrighted Works on BitTorrent

Numerous Defendants have erroneously alleged, based upon sheer false speculation, that Plaintiff's investigator, IPP, engages in what is referred to as a "Honeypot." Simply put, this is when a copyright owner seeds (uploads) copies of their own works on BitTorrent in order to create potential claims upon which to sue. Malibu is absolutely certain that no party or entity associated with it is uploading their Works to BitTorrent. An objective analysis demonstrates how preposterous this accusation truly is. Exhibit F is a list of the pirated copies of Malibu works included within suits filed within the Northern District of Illinois. There are 2,625 individual pirated copies of various Malibu works within its cases in this District, and many more within Malibu's national litigation effort. That Malibu would upload those thousands of pirated versions of their Works on BitTorrent while simultaneously incurring the time and expense to employ individuals whose sole responsibility is to issue take down notices requesting over 360,000 infringing URLs be removed via the Digital Millennium Copyright Act (**DMCA**) takedown notices is nonsensical. *See* Exhibit H. More importantly, Malibu's main source of revenue is from the subscribers of its website, not from lawsuits. Intentionally seeding its movies would only cause Malibu to incur more damage to its business and would hurt itself.

### G. Malibu is Entitled to Bring Lawsuits Against Infringers

The undeniable fact is that some people and entities will never agree with the enforcement of copyrights on the Internet. At first, critics labeled "copyright trolls" as those who acquired copyrighted content for the sole purpose of litigation. Once Judge Baylson of the Eastern District of Pennsylvania, as a component of Malibu's Bellwether trial, determined that Malibu did not fit this definition of a "copyright troll,"[3] the critics moved the goalposts and determined that any entity who derives an appreciable percent of their income from litigation is a "copyright troll." Once it was disclosed that a *de minimis* percent of Malibu's income is derived from litigation, the definition changed to an amorphous "anyone who files a lot of lawsuits." With that definition, any person or entity owning content that is heavily infringed is destined to be called a "troll."

"Many internet blogs commenting on this and related cases ignore the rights of copyright owners to sue for infringement, and inappropriately belittle efforts of copyright owners to seek injunctions and damages." *Malibu Media, LLC v. John Does 1, 6, 13, 14*, 950 F. Supp. 2d 779, 781 (E.D. Pa. 2013). Critics mainly devolve to *ad hominem* attacks and offensive and patently false suppositions about myriad issues including compliance with 18 U.S.C. § 2257, technicalities of contracts with vendors, and other such ancillary details unrelated to the core issues at hand in these cases. These detractors will claim to support copyrights in principle, but condemn those who try to enforce them. Chief Justice Marshall addressed this contention succinctly in ruling that "the very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he received an injury." *Marbury v. Madison*, 1 Cranch 137, 1803 WL 893, *17 (U.S. 1803). He continued "[t]he government of the

---

[3] *See Malibu Media, LLC v. John Does 1, 6, 13, 14*, 950 F. Supp. 2d 779, 780-81 (E.D. Pa. 2013) ("Malibu is *not* what has been referred to in the media and legal publications, and in the internet blogosphere, as a "copyright troll"—i.e., a non-producer who merely has acquired the right to bring lawsuits against alleged infringers. Rather, Malibu is an actual producer of adult films and owns valid copyrights, registered with the United States Copyright Office, in its works.")

United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Id.* The U.S. still deserves that high appellation because it steadfastly creates remedies when vested rights have been infringed. Malibu's cases in front of the bar are no exception.

I.      **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests the Court allow it to proceed with its case and grant it leave to serve a subpoena prior to a Rule 26(f) conference.

Dated:  April 6, 2014

Respectfully submitted,

SCHULZ LAW, P.C.

By:      /s/ *Mary K. Schulz*
         Mary K. Schulz, Esq.
         1144 E. State Street, Suite A260
         Geneva, Il 60134
         Tel:  (224) 535-9510
         Fax:  (224) 535-9501
         Email:  schulzlaw@me.com
         *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system.

By:      /s/ *Mary K. Schulz*